**STATE OF MINNESOTA**                    **DISTRICT COURT**

**COUNTY OF HENNEPIN**              **FOURTH JUDICIAL DISTRICT**

| | |
|---|---|
| CATHY GEBHARDT-LALLY and PATRICK WITT, individually, and on behalf of all others similarly situated, | Court File No.: _____ |
| Plaintiff | **SUMMONS** |
| v. | |
| ALLINA HEALTH SYSTEM d/b/a ALLINIA HEALTH, ESSENTIA HEALTH, HEALTHPARTNERS d/b/a PARK NICOLLET, and ST. FRANCIS REGIONAL MEDICAL CENTER, | |
| Defendants. | |

THIS SUMMONS IS DIRECTED TO ALLINA HEALTH SYSTEM d/b/a ALLINIA HEALTH

     **1.**    **YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons.  Do not throw these papers away. They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

     **2.**    **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS**.   You must give or mail to the person who signed this summons **a written response** called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

     Raina C. Borrelli
     Strauss Borrelli PLLC
     980 N. Michigan Avenue, Suite 1610
     Chicago, Illinois 60611
     raina@straussborrelli.com

     **3.**    **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

**4.** **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the complaint.

**5.** **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case**.

**6. ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.


  /s/ Raina C. Borrelli_____         9/30/2024_____
Plaintiff's attorney's signature                                   Dated


Raina C. Borrelli_____
Print or type plaintiff's attorney's name

**STATE OF MINNESOTA**                                    **DISTRICT COURT**

**COUNTY OF HENNEPIN**                          **FOURTH JUDICIAL DISTRICT**

| | |
|---|---|
| CATHY GEBHARDT-LALLY and PATRICK WITT, individually, and on behalf of all others similarly situated, | |
| | Court File No. _____ |
| Plaintiff | |
| | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| v. | |
| ALLINA HEALTH SYSTEM d/b/a ALLINIA HEALTH, ESSENTIA HEALTH, HEALTHPARTNERS d/b/a PARK NICOLLET, and ST. FRANCIS REGIONAL MEDICAL CENTER, | |
| Defendants. | |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, CATHY GEBHARDT-LALLY and PATRICK WITT, individually, and on behalf of all others similarly situated (hereinafter "Plaintiffs") bring this Class Action Complaint against Defendants, ALLINIA HEALTH, ESSENTIA HEALTH, HEALTHPARTNERS and ST. FRANCIS REGIONAL MEDICAL CENTER ("SFR" or "Defendants"), including by and through its agents, employees, and other representatives, and alleges, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.      Plaintiffs bring this class action to address Defendants' outrageous, illegal, and widespread practice of disclosing the confidential Personally Identifying Information[1] ("PII")

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or

and/or Protected Health Information[2] ("PHI") (collectively referred to as "Private Information") of Plaintiffs and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"), Google, LLC ("Google"), Microsoft Corporation ("Microsoft") and potentially others ("the Disclosure").

2.      The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[3] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[4] OCR and FTC warn that "[i]mpermissible disclosures of an individual's personal health information to third parties may result in a wide

---

government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).
[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). Defendants are clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.
[3] *Re: Use of Online Tracking Technologies*, U.S. Dep't of Health & Human Services (July 20, 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last accessed April 9, 2024), attached as Exhibit A.
[4] *Id.*

range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[5]

3.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.    Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

5.    In December 2022, HHS released a bulletin on its website regarding the use of tracking technologies by entities covered by HIPAA—healthcare entities like Defendant—and its

---

[5] *Id.*

business associates (the "December 2022 Bulletin").[6]

6.     Therein, HHS defined tracking technologies, explaining:

> Tracking technologies are used to collect and analyze information about how users interact with regulated entities' websites or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.[7]

7.     In the Bulletin, HHS was clear in unambiguous terms that, "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[8],[9]

8.     On March 18, 2024, HHS updated its December 2022 bulletin, "to increase clarity for regulated entities and the public" and reiterating the above basic privacy obligations.[10],[11]

---

[6] *See* archived version of the December 2022 Bulletin at *HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, HHS.gov (Dec. 1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 30, 2024).

[7] *Id.*

[8] *Id.* (bold emphasis in original)

[9] Citing *to* 45 CFR 164.508(a)(3); s*ee also* 45 CFR 164.501 (definition of "Marketing").

[10] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022, updated Mar. 18, 2024), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last acc. June 20, 2024).

[11] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

9.      Located in Shakopee, Minnesota, SFR[12] "provides a full range of inpatient, outpatient and emergency care services on a collaborative medical campus with more than 30 other clinics and more than 400 providers."[13]

10.     According to Defendants, SFR "is currently jointly-owned by Allina Health, HealthPartners Park Nicollet and Essentia Health."[14]

11.     Despite their unique position as a trusted healthcare provider, Defendants knowingly configured and implemented into its website, https://www.stfrancis-shakopee.com/ (the "Website") code-based tracking devices known as "trackers" or "tracking technologies," which collected and transmitted its patients' Private Information to Facebook, Google, Microsoft, and possibly other third parties, without its patients' knowledge or authorization.

12.     Defendants encourage their patients to use their Website, along with its various web-based tools and services (collectively, the "Online Platforms"), to learn about SFR on its website homepage[15], to find medical providers,[16] to find and research medical services,[17] to learn about health related topics in its "health library",[18] to pay bills,[19] access registration forms,[20] and more.

---

[12] At all times herein, Defendants' hospital, known as St. Frances Regional Medical Center, will be referred to as "SFR."

[13] https://www.stfrancis-shakopee.com/about-us/history/ (last visited Sept. 26, 2024).

[14] *About Us*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/about-us/history/ (Last visited Sept. 26, 2024).

[15] https://www.stfrancis-shakopee.com/ (last visited Sept. 26, 2024).

[16] *Provider directory*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/provider-directory/ (last visited Sept. 26, 2024).

[17] *Services*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/services/ (last visited Sept. 26, 2024).

[18] *Health library*, ST. FRANCIS REGIONAL MEDICAL CENTER https://www.stfrancis-shakopee.com/health-library/ (last visited Sept. 26, 2024).

[19] *Make a Payment*, ALLINA HEALTH, https://allinahealth.mysecurebill.com/mempayment (last visited Sept. 26, 2024).

[20] Allina Health preregistration form, ALLINA HEALTH, https://forms.allinahealth.org/Registration/Register (last visited Sept. 26, 2024).

13.     Plaintiffs and the Class Members visited Defendants' Online Platforms in relation to their past, present, and future healthcare needs and/or to transmit a payment for health care.

14.     When Plaintiffs and Class Members used Defendants' Website and Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendants embedded pixels from Facebook, Google, Microsoft, and possibly others, into its Website and Online Platforms, surreptitiously forcing Plaintiffs and Class Members to transmit intimate details about their medical treatment to third parties without their consent.

15.     A tracker (also referred to as "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[21] When a person visits a website with an tracker, it tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[22] Then, the tracker transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[23]

16.     Among the trackers Defendants embedded into their Website is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a website user's device and the URLs and domains they visit.[24] When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form

---

[21] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[22] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[23] *Id.*
[24] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 22, 2023).

submissions.[25] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[26]

17.     Operating as designed and as implemented by Defendants, the Meta Pixel allowed Defendants to unlawfully disclose Plaintiffs' and Class Members' private health information, alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendants effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook, without their authorization or knowledge.

18.     Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI") alongside use of the Meta Pixel.[27]

19.     Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interactions from the website owner's private servers, which transmits the data directly to Facebook, without involvement from the

---

[25] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).

[26] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses her Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." *What are Cookies?*, COULDFARE, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

[27] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, *How to Implement Facebook Conversions API (In Shopify)*, FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).

7

website user's browser.[28, 29]

20.     Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendants to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly. For this reason, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[30]

21.     Defendants utilized data from these trackers to market their services and bolster their profits. Facebook utilizes data from the Meta Pixel and CAPI to build data profiles for the purpose of creating targeted online advertisements and enhanced marketing services, which it sells for profit.

22.     On information and belief, the information that Defendants' Meta Pixel, and possibly CAPI, sent to Facebook included the Private Information that Plaintiffs and the Class Members submitted to Defendants' Website and Online Platforms, including, *inter alia*: their browsing activities, including the pages they viewed and the buttons they clicked; information concerning their statuses as patients such as patient portal activities; information concerning their medical concerns such as the providers they searched for and viewed and the medical services they

---

[28] *What is the Facebook Conversion API and How to Use It*, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/ (last updated May 20, 2022).

[29] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." *Conversions API*, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited May 15, 2023).

[30] About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).

viewed; as well as their identifying information, such as IP addresses and identifying cookies.

23.     Such information allows third parties (e.g., Facebook) to learn of a particular individual's health conditions and seeking of medical care. Facebook, in turn, sells Plaintiffs' and Class Members' Private Information to third-party marketers, who then target Plaintiffs and Class Members with online advertisements, based on the information they communicated to Defendants via the Website. Facebook and any third-party purchasers of Plaintiffs' and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

24.     In addition to the Facebook Pixel (and Facebook Events) and likely CAPI, on information and belief, Defendants installed other tracking technologies, DoubleClick Ads,[31] Google Analytics,[32] Google Tag Manager[33], and Microsoft Universal Event Tracking[34], which operate similarly to the Meta Pixel and transmitted Plaintiffs' and Class Members' Private Information to unauthorized third parties.

25.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send their private health information to a hidden third party—let alone Facebook, a company with a sordid history of violating consumer privacy in pursuit of ever-increasing advertising revenue.

26.     Neither Plaintiffs nor any Class Member signed a written authorization permitting

---

[31] *Meaningful insights. Smarter marketing. Better results*. GOOGLE,
https://marketingplatform.google.com/about/enterprise/ (last visited Sept. 26, 2024).
[32] *Get essential customer insights*, GOOGLE,
https://marketingplatform.google.com/about/analytics/ (last visited Sept. 26, 2024).
[33] *Introduction to Tag Manager*, GOOGLE,
https://support.google.com/tagmanager/answer/6102821?hl=en (last visited Sept. 26, 2024).
[34] *Event Tracking*, MICROSOFT,
https://about.ads.microsoft.com/en/tools/performance/conversion-
tracking#:~:text=Universal%20Event%20Tracking%20(UET)%20is,target%20audiences%20wit
h%20remarketing%20lists (last visited Sept. 26, 2024).

Defendants to send their Private Information to Facebook or other third parties uninvolved in their treatment.

27.    Despite willfully and intentionally incorporating the Meta Pixel, potentially CAPI, and other third-party trackers into its Website and servers, Defendants have never disclosed to Plaintiffs or Class Members that it shared their Information with Facebook, Google, Microsoft, and possibly others.

28.    Defendants further made express and implied promises to protect Plaintiffs' and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendants.

29.    Defendants owed common law, statutory, regulatory, and contractual duties to keep Plaintiffs' and Class Members' communications and Private Information safe, secure, and confidential.

30.    Upon information and belief, Defendants utilized the Meta Pixel and other trackers data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

31.    Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.

32.    Defendants breached their common law, statutory, and contractual obligations to Plaintiffs and Class Members by, *inter alia*, (i) failing to adequately review its marketing programs and web based technology to ensure the hospital Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and

received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Facebook and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiffs' and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiffs and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

33.      Plaintiffs seek to remedy these harms and bring causes of action for (I) Negligence; (II) Invasion of Privacy – Intrusion Upon Seclusion; (III) Breach of Implied Contract; (IV) Unjust Enrichment; (V) Violation of the Minnesota Health Records Act, Minn. Stat. § 144.291, *et seq*.; and (VI) Violation of the Minnesota Uniform Deceptive Trade Practice Act, Minn. Stat. § 325D.43-48.

**PARTIES**

34.      Plaintiff, CATHY GEBHARDT-LALLY, is a natural person and a resident and citizen of the State of Minnesota, where she intends to remain, with a principal residence in Shakopee, Minnesota in Scott County. She is a patient of Defendants, and a victim of their unauthorized Disclosure of Private Information.

35.      Plaintiff, PATRICK WITT, is a natural person and a resident and citizen of the State of Minnesota, where he intends to remain, with a principal residence in New Prague, Minnesota in Scott County. He is a patient of Defendants, and a victim of their unauthorized Disclosure of Private Information.

36.      Defendant, ALLINA HEALTH SYSTEM d/b/a ALLINIA HEALTH ("Allinia Heath"), is a business entity organized under the laws of Minnesota with principal place of business and registered address at 2925 Chicago Ave Mail Route 10905, Minneapolis, MN 55407.

Defendant Allina Health is one of the owners of SFR.[35]

37.    Defendant, ESSENTIA HEALTH, is a nonprofit corporation organized under the laws of Minnesota with principal place of business and registered address at 502 East Second Street Duluth, MN 55805. Defendant Essentia Health is one of the owners of SFR.[36]

38.    Defendant, HEALTHPARTNERS d/b/a PARK NICOLLET ("Healthpartners"), is a business entity organized under the laws of Minnesota with principal place of business and registered address at 8170 33rd Ave. S, Bloomington MN 55425. Defendant Healthpartners is one of the owners of SFR.[37]

39.    Defendant, ST. FRANCIS REGIONAL MEDICAL CENTER ("SFR"), is a nonprofit corporation organized under the laws of Minnesota with principal place of business and registered address at 1445 St Francis Ave, Shakopee, MN 55379.

### JURISDICTION & VENUE

40.    This Court is vested with subject-matter jurisdiction pursuant to Minn. Const. art. VI, § 3 and Minn. Stat. § 484.01, subd. 1.

41.    This Court has general personal jurisdiction over Defendants because they are Minnesota corporations, maintain their principal place of business in Minnesota, and provide medical care and treatment services to Minnesota citizens.

42.    Venue is proper in this Court pursuant to Minn. Stat. § 13.08 and §542.09 as two of the Defendants' three joint owners' principal places of business (Allina Health and HealthPartners) are located in Hennepin County, Minnesota, where the cause of action or some part thereof arose.

---

[35] *About Us*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/about-us/history/ (Last visited Sept. 26, 2024).
[36] *Id.*
[37] *Id.*

43.     Further, the "Terms and conditions of use"[38] that purportedly govern Defendants'

Website state:

### Governing law, jurisdiction and venue

These Terms and Conditions of Use will be governed under the laws of the State of Minnesota without regard to its conflicts of law provisions. *All actions or proceedings arising out of or relating to these Terms and Conditions of Use will be venued exclusively in state or federal court in the City of Minneapolis and County of Hennepin, Minnesota.* You hereby irrevocably consent and submit to the personal jurisdiction of said courts for all such purposes. However, we retain the right to bring legal proceedings in any jurisdiction where we believe that infringement of these Terms of Use is taking place or originating.[39]

## COMMON FACTUAL ALLEGATIONS

### A. Background

44.     Founded in 1938, SFR operates a hospital consisting of "93 licensed acute care

beds," five clinics, two "express care" facilities, a pharmacy, and two urgent care facilities.[40,41]

45.     SFR states that in 2019, it "saw 6,125 inpatient admits, 130,785 outpatient

encounters, 32,505 emergency department visits and 1,069 newborns delivered."[42]

46.     SFR states that it "will consistently be recognized as one of the best community

hospitals in the United States."[43]

47.     In 2023, SFR had a patient revenue of $553,998,470.[44]

---

[38] Defendants' Website Terms are attached hereto as **Exhibit C.**

[39] *Id.* (emphasis added)

[40] *History*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/about-us/history/ (Last visited Sept. 26, 2024).

[41] *Locations*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/locations/ (Last visited Sept. 26, 2024).

[42] *History*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/about-us/history/ (Last visited Sept. 26, 2024).

[43] *Mission, vision and values*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/about-us/mission-vision-and-values/ (Last visited Sept. 26, 2024).

[44] *Saint Francis Regional Medical Center*, AMERICAN HOSPITAL DIRECTORY, https://www.ahd.com/free_profile/240104/Saint_Francis_Regional_Medical_Center/Shakopee/Minnesota/ (last visited Sept. 26, 2024).

48.    Defendants' encourage patients to utilize their Online Platforms to learn about billing information[45], pay a bill[46], learn about the healthcare services provided,[47] find a location,[48] and search the provider directory.[49]

49.    Defendants provide a myriad of medical services, including: acupuncture**,** birthing services**,** including a level II special care nursery**,** cancer care, cardiology**,** ear, nose and throat services, emergency medicine, express care**,** imaging**,** gastroenterology**,** nutrition services, orthopedics and spine services, pain management, pediatric therapy, plastic and reconstructive surgery, podiatry, pulmonology, rehabilitation services, orthotics**,** physical and occupational therapy**,** speech therapy, sports medicine**,** stroke care**,** surgical services, urgent care, urology**,** women's healthcare, and wound care.[50]

50.    SFR promotes the comprehensive functionality of its Online Platforms and promotes their use, in service of its own goal of increasing profitability. In furtherance of that goal, SFR purposely installed the Meta Pixel and other trackers onto its Website, for the purpose of gathering information about Plaintiff and Class Members to further its marketing efforts. But SFR did not only generate information for its own use: it also shared patient information, including Private Information belonging to Plaintiffs and Class Members, with Facebook, and other unauthorized third parties.

---

[45] *Billing information*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/patients-and-visitors/billing-information/ (Last visited Sept. 26, 2024).

[46] *Find and pay your bill*, ALLINIA HEALTH, https://www.allinahealth.org/paybill (Last visited Sept. 26, 2024).

[47] *Services*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/services/ (Last visited Sept. 26, 2024).

[48] *Locations*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/locations/ (Last visited Sept. 26, 2024).

[49] *Provider Directory* ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/provider-directory/ (Last visited Sept. 26, 2024).

[50] *Services*, ST. FRANCIS REGIONAL MEDICAL CENTER, https://www.stfrancis-shakopee.com/services/ (Last visited Sept. 26, 2024).

i.    *Facebook's Business Tools and the Meta Pixel*

51.    Facebook operates the world's largest social media company and generated nearly $134 billion in revenue in 2023, roughly 99% of which was derived from selling advertising.[51]

52.    In conjunction with its advertising business, Facebook encourages and promotes its "Business Tools" to be used to gather customer data, identify customers and potential customers, target advertisements to those individuals, and market products and services.

53.    Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

54.    The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, clicks a button, fills out a form, and more.[52] Businesses that want to target customers and advertise their services can also create their own tracking parameters by building a "custom event."[53]

55.    The Meta Pixel is a Business Tool used to "track[] the people and type of actions they take" on a website.[54] When an individual accesses a webpage containing the Meta Pixel, the

---

[51] *Meta Reports Fourth Quarter and Full Year 2023 Results*, META (Feb. 1, 2024), https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx.

[52] *Specifications for Facebook Pixel Standard Events,* META, https://www.facebook.com/business/help/402791146561655 (last visited June, 21, 2024); *see also Facebook Pixel, Accurate Event Tracking, Advanced*, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also Best Practices for Facebook Pixel Setup*, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited June 21, 2024).

[53] *About Standard and Custom Website Events*, META, https://www.facebook.com/business/help/964258670337005; *see also* Facebook, App Events API, *supra*.

[54] *Retargeting*, META, https://www.facebook.com/business/goals/retargeting (last visited June 21, 2024).

communications with that webpage are instantaneously and surreptitiously duplicated and sent to Facebook, traveling directly from the user's browser to Facebook's server, based off instructions from the Meta Pixel.

56.    Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy, such as a homepage, and disable it on pages that do implicate patient privacy, such as Defendant's "Services" pages.

57.    The Meta Pixel's primary purpose is to enhance online marketing, improve online ad targeting, and generate sales.[55]

58.    Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[56]

59.    According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** [Emphasis added.]

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity,

---

[55] *See Meta Pixel*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed June 21, 2024).
[56] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153 (last visited June 21, 2024).

etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[57]

60.    Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.
- **Drive more sales**. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.
- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[58]

61.    Facebook likewise benefits from Meta Pixel data and uses it to enhance its own ad targeting abilities.

###   ii.    *Defendants' method of transmitting Plaintiffs' and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel*

62.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

63.    Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

64.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP

---

[57] *Meta Pixel*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last visited June 21, 2024).
[58] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153 (last visited June 21, 2024).

Responses, along with corresponding cookies.[59]

65.      GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

66.      When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information. The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

67.      Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

68.      Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

69.      In this way, the Meta Pixel acts much like a traditional wiretap: intercepting and transmitting communications intended only for the website host and diverting them to Facebook.

70.      Separate from the Meta Pixel, third parties place cookies in the browsers of web users. These cookies can uniquely identify the user, allowing the third party to track the user as they browse the internet—on the third-party site and beyond. Facebook uses its own cookie to

---

[59] "Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." *What are cookies?*, CLOUDFLARE, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Aug. 12, 2024).

identify users of a Meta-Pixel-enabled website and connect their activities on that site to their individual identity. As a result, when a Facebook account holder uses a website with the Meta Pixel, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the user associated with the information it has intercepted.

71.    With substantial work and technical know-how, internet users can sometimes circumvent these browser-based wiretap technologies. To counteract this, third parties bent on gathering data implement workarounds that are difficult for web users to detect or evade. Facebook's workaround is Conversions API, which "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[60] This makes Conversions API a particularly effective tool because it allows sends Facebook data directly from the website server to Facebook, without relying on the user's web browser. Notably, client devices do not have access to host servers containing Conversions API, and thus, they cannot prevent (or even detect) this transmission of information to Facebook.

72.    While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the website server, Facebook instructs entities like SFR to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."[61]  Consequently, if a website owner utilizes the Meta Pixel on its website, it is also reasonable to infer that it implemented the Conversions API on its website

---

[60] *About Conversions API,* META, https://www.facebook.com/business/help/2041148702652965 (last visited June 21, 2024).
[61] *See Best Practices for Conversions API*, META,
https://www.facebook.com/business/help/308855623839366 (last visited June 21, 2024).

server(s), in accordance with Facebook's documentation.

73.     The Meta Pixel, Conversions API, and other third-party trackers do not provide any substantive content on the host website. Rather, their only purpose is to collect information to be used for marketing and sales purposes.

74.     Accordingly, without any knowledge, authorization, or action by a user, a website owner can use its website source code to commandeer its users' computing devices and web browsers, causing them to invisibly re-direct the users' communications to Facebook, and others.

75.     In this case, SFR employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

76.     Consequently, when Plaintiffs and Class Members visited SFR's Website and communicated their Private Information, it was simultaneously intercepted and transmitted to Facebook.

### iii.    *Defendants' Other Trackers: Google Analytics, DoubleClick Ads, and Microsoft Universal Event Tracking*

74.     SFR also employed other trackers, including Google Analytics, DoubleClick Ads, and Microsoft Universal Event Tracking, which, on information and belief likewise transmitted Plaintiffs' and the Class Members' Private Information to third parties without Plaintiffs' and Class Members' knowledge or authorization.

75.     Most basically, "Google Analytics is a platform that collects data from your websites and apps to create reports that provide insights into your business."[62] Once a business implants the Google Analytics tracking measurement code on a its website, every time a user visits

---

[62] *Analytics Help, Introduction to Analytics How Google Analytics works*, GOOGLE https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939&sjid=301658 8406699844463-NC (last visited Aug. 12, 2024).

a webpage, the tracking code will collect information about how that user interacted with the page.[63]

76.  Google Analytics allows Defendants to track and share with Google (1) who uses its website; (2) what is performed on its website; (3) when users visit its website; (4) where on the website users perform these actions; and (5) how users navigate through the website to perform these actions. Google gathers this information using trackers embedded on SFR's Website and generates corresponding reports.[64]

77.  To help Google generate reports (usually in realtime), trackers embedded in a website send Google (1) information about the user's device; (2) client- and user-specific identifiers; and (3) information about what event the user performed.

78.  According to Google, "Google Tag Manager is a tag management system (TMS) that allows you to quickly and easily update measurement codes and related code fragments collectively known as *tags* on your website or mobile app. Once the small segment of Tag Manager code has been added to your project, you can safely and easily deploy analytics and measurement tag configurations from a web-based user interface."[65]

79.  As Google goes onto describe:

When Tag Manager is installed, your website or app will be able to communicate with the Tag Manager servers. You can then use Tag Manager's web-based user interface to set up tags, establish *triggers* that cause your tag to fire when certain events occur, and create *variables* that can be used to simplify and automate your tag configurations.

A collection of tags, triggers, variables, and related configurations installed on a

---

[63] *Id.*

[64] *See generally A big list of what Google Analytics can & cannot do*, MARKETLYTICS, https://marketlytics.com/blog/list-of-things-google-analytics-can-and-cannot-do/ (last visited Aug. 12, 2024).

[65] *See Introduction to Tag Manager,* GOOGLE, https://support.google.com/tagmanager/answer/6102821?hl=EN#:~:text=Google%20Tag%20Manager%20is%20a,your%20website%20or%20mobile%20app (last visited Aug. 12, 2024).

given website or mobile app is called a ***container***. A Tag Manager container can replace all other manually-coded tags on a site or app, including tags from Google Ads, Google Analytics, Floodlight, and 3rd party tags.[66]

80.    Defendants also utilizes Double Click Ads. Google's DoubleClick is "an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[67]

81.    DoubleClick includes DoubleClick Digital Marketing Manager ("Ad serving and management solutions for your digital advertising campaigns, including trafficking and reporting"), Google Analytics, and more.[68]

82.    Information gathered through DoubleClick can be used by Google to personalize the advertisements users are targeted with across the web. *See*, e.g., https://www.nordea.com/en/doubleclick-cookies:

---

[66] *Id*.

[67] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en (last visited Aug. 12, 2024).

[68] *Id*.



83.    Additionally, SFR utilized Universal Event Tracking ("UET") from Microsoft on SFR's Allina Health/MyChart patient portal pages.

84.    Microsoft Universal Event Tracking ("UET"), is "a mechanism for [website owners] to report user activity on their websites to Microsoft Advertising by installing one site-wide tag . . . Once the UET tag is installed by the [website owners] across their website, the tag

reports user activity on the [] website to Microsoft Advertising."[69]

85.    UET "UET will also collect the IP address and the Microsoft cookie (with an expiration date of 13 months). This cookie contains a GUID[70] assigned to the user's browser, and/or an ID assigned to a user as long as it authenticated through their Microsoft account."[71]

86.    On information and belief, through these other trackers, Google Analytics, Doubleclick, and UET, SFR transmitted Plaintiffs' and the Class Members' Private Information to Facebook and those other third parties without Plaintiffs' and Class Members' knowledge or authorization.

### iv.    Defendants Violated their Own Privacy Policies

87.    Defendants maintain and are covered by a Notice of Privacy Practices[72] and a Privacy Policy,[73] and a Website Terms and Conditions of Use[74] ("Website Terms") (collectively the "Privacy Policies") which are posted on their Website.[75,76]

88.    Defendants' Notice of Privacy Practices states:

Our Health Information Responsibilities
- We have a duty to protect the privacy of your health information and to give you this Notice.
- We have a duty to follow our current Notice of Privacy Practices.

---

[69] *Event Tracking*, MICROSOFT, https://about.ads.microsoft.com/en/tools/performance/conversion-tracking#:~:text=Universal%20Event%20Tracking%20(UET)%20is,target%20audiences%20with%20remarketing%20lists (last visited Sept. 26, 2024).
[70] According to Microsoft, a GUID "is a globally unique identifier . . . Every entity that needs to be uniquely identified (such as an interface) has a GUID. *Globally Unique Identifier (GUID)*, MICROSOFT, https://learn.microsoft.com/en-us/previous-versions/windows/desktop/automat/globally-unique-identifier-guid- (last visited Sept. 26, 2024).
[71] *FAQ: Universal Event Tracking*, MICROSOFT, https://help.ads.microsoft.com/#apex/3/en/53056/2 (last visited Sept. 26, 2024).
[72] Defendants' Notice of Privacy Practices is attached hereto as **Exhibit A**.
[73] Defendants' Privacy Policy is attached hereto as **Exhibit B.**
[74] Defendants' Website Terms are attached hereto as **Exhibit C.**
[75] The Website footer links to the page – *Privacy policy*, ALLINA HEALTH, https://www.allinahealth.org/footer/privacy-policy (last visited Sept. 26, 2024).
[76] *Terms and conditions of use*, ALLINIA HEALTH, https://www.allinahealth.org/footer/terms-and-conditions-of-use (last visited Sept. 26, 2024).

- We will abide by the terms of the Notice.[77]

89. The Notice of Privacy Practices applies to:

This Notice describes Allina Health's practices and that of:
- all providers, departments, and units of Allina Health
- all residents, medical students, and other trainees affiliated with Allina Health
- all employees, volunteers, staff and other Allina Health workers,

90. SFR and its employees and agents are "providers, departments, and units of Allina Health" and/or "employees, volunteers, staff and other Allina Health workers" covered under the Notice of Privacy Practices.

91. Defendants enumerate certain purposes for which they may disclose a patient's PHI:

**Uses and Disclosures of Health Information**
To provide you with the best quality care, we need to use and disclose health information. We safeguard your health information whenever we use or disclose it. We follow this Notice of Privacy Practices and the law when we use and disclose health information. We may use and disclose your health information as follows:

*Treatment, Payment, and Health Care Operations* . . .

*Disclosures to Business Associates*. We may contract with other organizations to provide services on our behalf. In these cases, we will enter into an agreement with the organization explicitly outlining the requirements associated with the protection, use, and disclosure of your protected health information.

*Medical Emergency*. . .

*Appointment Reminders and Treatment Alternatives*. . .

*Patient Information Directory* . . .

*People Involved in Your Care*. We may disclose limited health information to people involved in your care (for example, a family member or emergency contact) or to help plan your care. . .

*Foundations/Fundraising* . . .

---

[77] Ex. A.

***Research***. We may use or share your health information for research purposes as allowed by law or if you have given permission . . .

***Death*** . . .

***Health Care Workplace Medical Surveillance/Injury/Illness***. If your employer is a health care provider, we may share health information required by state or federal law . . .

***Law Enforcement***. We may disclose certain health information to law enforcement . . .

***Correctional Facility***. We may disclose the health information of an inmate or other person in custody to law enforcement or a correctional institution . . .

***Abuse, Neglect, or Threat***. We may disclose health information to the proper authorities about possible abuse or neglect of a child or a vulnerable adult. If there is a serious threat to a person's health or safety, we may disclose information to that person or to law enforcement . . .

***Food and Drug Administration (FDA) Regulation***. We may disclose health information to entities regulated by the FDA to measure the quality, safety, and effectiveness of their products . . .

***Military Authorities/National Security*** . . .

***Immunization Records***. We may disclose your immunization records to the Minnesota Immunization Information Connection or Wisconsin Immunization Registry . . .

***Public Health***. We may disclose health information about you for public health purposes . . .

***Required by Other Laws***. We may use or disclose health information as required by other laws . . .

***Information with additional protections***. Certain types of health information may have additional protection under federal or state law. For example, federally assisted alcohol and drug abuse programs are subject to certain special restrictions on the use and disclosure of alcohol and drug treatment information. To the extent applicable, Allina Health would need to get your written permission before disclosing that information to others in many circumstances.[78] (emphasis in original)

---

[78] *Id.*

92.    None of the foregoing purposes include Defendants' disclosure of patients' Private Information to third parties uninvolved in their treatment for marketing purposes, without their authorization, as occurred in the Disclosure.

93.    In fact, Defendants' Notice of Privacy Practices expressly prohibits the unauthorized disclosure of Private Information:

**With Your Authorization**

*We may use or disclose health information only with your written permission*, except as described above. Most uses and disclosures of psychotherapy notes (special notes kept by mental health providers for only their own use when treating a patient), *health information for marketing purposes, and the sale of health information require written authorization.*[79]

94.    Defendants declare that their Website Privacy Policy applies to "the information we collect from or about you through this Site."[80]

95.    In the Privacy Policy, Defendants enumerate the Private Information they collect:

Allina Health collects information that is sent to us automatically by your web browser or mobile device. This information typically includes:
  a.    your IP address
  b.    browser type
  c.    referring/exit pages
  d.    operating system type and version
  e.    a date/time stamp
  f.    estimated geographic location
  g.    other information associated with the interaction of your browser and this Site (collectively referred to as "Traffic Data")[81]

96.    None of the foregoing purposes include the disclosure of patients' Private Information without authorization to third parties uninvolved in their treatment, for marketing purposes.

97.    The Privacy Policy then admits that Defendants identify patients using their

---

[79] *Id.* (emphasis added)
[80] Ex. B.
[81] *Id.*

website:

> The information we receive may depend on your browser or device settings. Traffic Data is stored in temporary log files that reside on our web servers.

> Traffic Data is not, in and of itself, personally identifiable. Generally, we use Traffic Data in the aggregate to help us improve this Site and make it more compatible with the technology used by our visitors. However, *we may combine Traffic Data with other information in an attempt to identify you or we may combine it with information that does identify yo*u.[82]

98.     In regard to tracking technologies, The Privacy Policy states:

**Information collected by cookies and other technologies**

> We use "cookies" and other technologies to collect information and support certain features of this Site. For example, we may use these technologies to:
> - collect information about the ways visitors use this Site—which pages they visit, which links they use, and how long they stay on each page
> - support the features and functionality of this Site—for example, to save you the trouble of reentering information already in our database or to prompt the settings you established on previous visits
> - personalize your experience when you use this Site
> - *improve our marketing efforts, including through use of targeted advertising*

> *The information we collect using cookies and similar technologies is not, in and of itself, personally identifiable, but we may link it to personal information that you provide*. If you do not wish to receive cookies, you may set your browser to reject cookies or to alert you when a cookie is placed on your computer. Although you are not required to accept cookies when you visit this Site, you may be unable to use all of the functionality of this Site if your browser rejects our cookies.[83]

99.     The Privacy Policy then admits Defendants use Google Analytics to collect

patients' data, which, on information and belief, includes patients' Private Information:

**Information about third-party cookies**

> In addition to the cookies Allina Health delivers to your computer or mobile device through this Site, certain third parties may deliver cookies to you for a variety of reasons. For example, *we use Google Analytics, a web analytics tool that helps us*

---

[82] *Id.* (emphasis added)
[83] *Id.* (emphasis added)

understand how visitors engage with our Sites. See information from Google Analytics about safeguarding your data

*Other third parties may deliver cookies to your computer or mobile device for the purpose of tracking your online behaviors over time* and across non-affiliated websites and/or delivering targeted advertisements either on this Site or on other websites.

You have choices about the collection of information by third parties on our Sites. For example, if you don't want information about your visit to this Site sent to Google Analytics, you may download an Opt-out Browser Add-on at tools.google.com.

Please note that the Add-on does not prevent information from being sent to Allina Health.

To opt out of having interest-based information collected by certain entities during your visits to this site or other websites, go to aboutads.info/choices. This industry-developed website contains mechanisms for choosing whether each listed entity may collect and use data for online behavioral advertising purposes. *It may be that some of the third parties that collect interest-based information on this site do not participate in the industry-developed opt-out website, in which case the best way to avoid third-party tracking of your online behaviors may be through your browser settings and deletion of cookies.*[84]

100.    The "opt-out" extension available at tools.google.com, described in paragraph 99 above, will block Google Analytics but will not disable trackers from Doubleclick, Facebook, Microsoft, or any other trackers installed on Defendants' Website. Thus, Defendants' opt-out notice does not prevent its patients' Private Information from be transmitted to third parties uninvolved in their treatment, for marketing purposes, as Defendants suggest.

101.    The "opt-out" extension available at aboutads.info/choices, described in paragraph 99 above, does not stop SRF's patients' Private information from being sent to Google, Facebook, and Microsoft.

102.    Defendants' Privacy Policy then lists how Defendants use the information they collect from patients using their website:

---

[84] *Id.* (emphasis added)

We generally reserve the right to disclose information you submit to us through this Site as set forth below. *Please note, however, that disclosure of protected health information submitted through this Site is governed exclusively by our Notice of Privacy Practices.*

**With third–party vendors**

Allina Health shares information collected through this Site with third-party vendors who act for us or on our behalf. For example, we may use third-party vendors to design and operate this Site; to conduct surveys; and to help us with our promotional efforts. These third-party vendors may need information about you to perform their functions, but they are contractually obligated to use your information only to perform contracted-for services.

**With other users of this site**

You may be able to submit User-Generated Content on or through this Site . . .

**With our affiliates**

As permitted by applicable law, Allina Health may share the information collected through this Site with other entities within the Allina Health corporate structure . . .

**In aggregate or de-identified form**

We use information collected through this Site to create a compiled, aggregate view of usage patterns. We may share aggregate information with third parties so we and they can better understand our user base. *We may also share with third parties information about how particular individuals use this Site, but only on a de-identified basis ("Individualized Data"). Individualized Data is not personally identifiable,* but it does reflect the usage patterns of a particular Site user, as opposed to Site users collectively. We may provide basic demographic information (gender and age) in conjunction with providing Individualized Data. *Third parties may use this information for analytical purposes and to market their own products and services,* and for such other purposes as we may authorize. *We will take reasonable efforts to ensure that third parties cannot and do not re-identify Individualized Data, including by contractually prohibiting them from doing so.*

**As part of a business transfer**

Your information may be transferred to successor organization if, for example, we transfer the ownership or operation of this Site to another organization . . .

**To comply with laws and protect our rights and the rights of others**

We may disclose your information when we, in good faith, believe disclosure is appropriate to comply with the law, a court order or a subpoena. We may also disclose your information to prevent or investigate a possible crime, such as fraud or identity theft; to protect the security of this Site; to enforce or apply our online Terms and Conditions of Use or other agreements; or to protect our own rights or property or the rights, property or safety of our users or others.

27-CV-24-14694

CASE 0:24-cv-04100-LMP-TNL    Doc. 1-1    Filed 11/01/24    Page 33 of 90    Filed in District Court
State of Minnesota
9/30/2024 3:54 PM

**As described in a privacy notice or click-through agreement**
We reserve the right to disclose your information as described in any Privacy Notice posted on a page of this Site where you provide that information. *By providing your information on that page you will be consenting to the disclosure of your information as described in that Privacy Notice.* We also reserve the right to disclose your information as described in any click–through agreement to which you have agreed.[85]

103.    None of the foregoing purposes include the disclosure of patients' Private Information without authorization to third parties uninvolved in their treatment, for marketing purposes.

104.    However, on information and belief, third parties "market their own products and services" to Defendants' patients due to Defendants' Disclosures.

105.    Although Defendants' Privacy Policy disclosed some use of Google Analytics, it did not disclose Defendants' Use of Google Analysis to transmit patients' Private Information to third parties, or Defendants' use of the Facebook Pixel or Microsoft's UET, to share patients' Private Information to third parties uninvolved in their treatment, for marketing purposes.

106.    Finally, Defendants' Website Terms represents that:

**Your acceptance of these Terms and Conditions of Use**
These Terms and Conditions of Use apply to all users of this Site. By using this Site you are agreeing to comply with and be bound by these Terms and Conditions of Use. If you do not agree to these Terms and Conditions of Use, you may not access or use this Site.

**Your acceptance of our Privacy Policy**
By agreeing to these Terms and Conditions of Use, you agree to the terms of our Privacy Policy, which is expressly incorporated herein. Before using this Site, please carefully review our Privacy Policy. All personal information provided to us as a result of your use of this Site will be handled in accordance with our Privacy Policy and, to the extent applicable, our Notice of Privacy Practices.[86]

107.    In reference to the "MyChart" interactive health database, Defendants' Website

---

[85] *Id.* (emphasis added)
[86] Ex. C.

Terms document states:

> *Information about the care and services you receive, such as medical history, current conditions, treatment plan and all treatments given, including the results of all tests, procedures and therapies, is maintained in the health record.*
> The Allina Health account gives secure online access to wellness tools and select, limited health information in the interactive health record (MyChart) to a patient, or a person who the patient chooses (proxy). A patient's entire health record is not reproduced online in the interactive health record. The interactive health record is a selected part of the information in a patient's health record, such as prescriptions, basic test results, summary medical history, appointments and similar information. *Your provider may decide which types of information to release into your interactive health record.*
>
> Individuals with an Allina Health account agree to use it as their primary means to obtain tests results performed at participating facilities. *Test results will be delivered electronically to the account in most cases.* Individuals with an Allina Health account also agree that an electronic copy of their discharge instructions be provided for each inpatient admission.[87]

108.     The above disclosure in Defendants' Website Terms did not inform patients that Defendants' utilized Microsoft's UET tracker to transmit patients' Private Information to third parties uninvolved in their treatment, for marketing purposes.

109.     Despite the representations in their Privacy Policies, Defendants indeed transfer their patients' individualized Private Information to third parties for marketing purposes, without written authorization, and without patients' knowledge. Using the Meta Pixel and other tracking technologies, such as Google Analytics, DoubleClick Ads, and Microsoft' UET , Defendants used and disclosed Plaintiffs' and Class Member's individualized Private Information and confidential communications to Facebook, and other unauthorized third parties, without written authorization, in violation of their Privacy Policies.

**v.     *Defendants Unauthorizedly Disclosed Plaintiffs' and the Class's Private Information via the Meta Pixel and Related Tracking Technologies***

---

[87] *Id.*

110.    SFR disclosed Plaintiffs' and Class Members' Private Information and confidential communications to Facebook and other third parties including Google, and Microsoft, via the Meta Pixel and other tracking technologies, without Plaintiffs' and Class Members' authorization, for marketing purposes.

111.    On information and belief, the information that Defendants sent to Facebook and other technology companies included the Private Information that Plaintiffs and the Class Members submitted to Defendants' Website and Online Platforms, including, *inter alia*: their browsing activities; the pages they viewed and the buttons they clicked; information concerning their statuses as patients such as patient portal activities; information concerning their medical concerns such as the providers they searched for and viewed, and the medical services they viewed; as well as their identifying information, such as IP addresses and identifying cookies.

112.    On information and belief, SFR began disclosing its patients' data at least as early as February 11, 2010 when it first installed a Google Analytics tracker. Beginning no later than February 4, 2017 SFR added a Meta Pixel with ID 1259198927499974 ("Pixel1") to its Website.

113.    On or around December 21, 2018, SFR had enabled Automatic Setup which would cause Pixel1 to transmit Microdata and SubscribedButtonClick events in addition to PageView events, to Facebook.

114.    SFR continues to install Pixel1 today; however, SFR has Data Restrictions enabled, which reduces the scope of Pixel1's disclosures to Facebook.

115.    Accordingly, SFR has disclosed its users' data to third parties from at least as early as February 11, 2010 through the present. SFR also disclosed its patients' data to Facebook from at least as early as February 4, 2017 through the present.

116.    Prior to SFR installing Data Restrictions, which, on information and belief,

occurred some time after December 21, 2018 SFR would report user details to Facebook as soon as a patient loaded its homepage.

117.    As a patient loaded SFR's homepage, SFR would send PageView and Microdata events to Facebook reporting that the user was on the page, "https://www.stfrancis-shakopee.com/."



118.    The Microdata event further informs Facebook that the user was learning about SFR, which "ranks in the top 10% of hospitals nationwide for care and quality."

119.    As patients navigated from the homepage to other pages, SFR would continue to disclose information about patients': (i) keyword search activities; (ii) provider search activities; (iii) location search activities; (iv) service browsing activities; and (v) billing related activities.

120.    In each of the Meta Pixel events that SFR sends to Facebook, SFR includes the "c_user" cookie, which Facebook uses to identify patients using the Website.



121.    Facebook can therefore connect cookie data that SFR transmits with specific SFR

patients. Furthermore, Facebook's "Your activity off Meta technologies" report confirms that Facebook receives the data SFR shares with Facebook.



***SFR Disclosed Patients' Keyword Search Activities***

122.    SFR reported details of patients' search activities to Facebook as patients performed keyword searches on SFR's Website.

123.    Patients could perform a keyword search for relevant content from SFR's homepage. Upon a patient's navigation to view the search menu, SFR would inform Facebook about the patient's action via a SubscribedButtonClick event.



124.    The event informs Facebook that the patient loaded the search menu directly from the page titled "Home | St. Francis Regional Medical Center."

125.    SFR would continue to report information to Facebook regarding patients as patients performed keyword searches and interacted with their search results.

126.    Among the information that SFR shared about the patients was the specific keywords that patients searched for. For example, when a patient searched for the keyword, "cancer" on SFR's website, SFR would report that the patient searched for "query=Cancer," through a pair of PageView and Microdata events.

127.    Then, as patients loaded pages from their keyword search results, SFR would report that to Facebook as well. When the patient loaded the Cancer Care page from their cancer keyword search, for example, SFR would transmit another set of PageView and Microdata events reporting that the patient loaded the page for "services/cancer-care/" at the "St. Francis Cancer Center."



128.    SFR would continue to disclose information about patients after they opened pages from their search results. For instance, after the patient loaded the Cancer Care page and clicked to find locations offering cancer care or to watch a video about the Cancer Center, SFR would report those activities to Facebook through SubscribedButtonClick events.

129.    The SubscribedButtonClick event sent upon the patient's click for locations reveals the patient clicked to "Find a location," while they were on the page, "Cancer care | St. Francis Regional Medical Center." This would lead to the St. Francis Cancer Center page.

130.    As the St. Francis Cancer Center page loaded, SFR would transmit a set of

PageView and Microdata events disclosing the patient's navigation.



131.    If the patient then clicked to call the St. Francis Cancer Center, SFR would report that to Facebook through a **SubscribedButtonClick** event, revealing the patient called "952.428.4141," while they were viewing the page, "St. Francis Cancer Center | St. Francis Regional Medical Center."

### SFR Disclosed Patients' Provider Search Activities

132.    SFR also informed Facebook as its patients used SFR's provider directory to find a doctor.

133.    As soon as a patient navigated to the Provider Directory page, SFR would send Facebook PageView and Microdata events reporting the patient's navigation to the page, "https://www.stfrancis-shakopee.com/provider-directory/."

134.    The Microdata event further informs Facebook that the patient was viewing "a list of providers at St. Francis Regional Medical Center."



135.    Patients could filter the provider directory based on a variety of preferences. When a patient filtered the directory based on their preferences, SFR would report the patient's preferences to Facebook.

136.    For example, when a patient filtered the directory for: female physicians, who specialize in oncology and radiation, who practice within 20 miles of the zip code 55379, in the city of Shakopee, at the facility, St. Francis Cancer Center, who spoke Spanish, and is accepting new patients, SFR would report each of such filters to Facebook through a PageView event.



137.    The PageView event reports that the patient was searching SFR's "provider

directory," based on the filters: (i) "gender=Female," (ii) "specialty=oncology," and "Radiation%20Oncology," (iii) with the location parameters of "distanceAmount=20%&distance=55379," in the "city=Shakopee," at the "facility=St%2Francis%20Cancer%20Center," (iv) who could speak "language=Spanish," and (v) who was accepting "newpatients=true."

138.    SFR would also report the number of physicians who matched patients' criteria as they clicked to view matching providers. For example, if a patient clicked to view the results for providers who specialized in oncology and were accepting new patients, SFR would send a SubscribedButtonClick event informing Facebook that the patient clicked to "Show 6 providers," who matched their search for providers with a specialty of "specialty=Oncology," and was accepting "newpatients=true."

139.    SFR would also inform Facebook about the physicians that patients were interested in after patients performed their provider search. For instance, when the patient loaded the profile page for Claudia Baumann, MD, SFR would send a pair of PageView and Microdata events to Facebook.



140.    Both events inform Facebook that the patient loaded the page for "providers/claudia-baumann," from their search for oncology providers who were accepting new patients. The Microdata event provides additional information about Dr. Baumann as well,

including the address of Dr. Baumann's practice location.

141.    If the patient clicked to call Dr. Baumann, SFR would send a SubscribedButtonClick event to Facebook, reporting the patient's click to dial "tel:+19324282031" while they were on the profile page for Dr. Baumann.

***SFR Disclosed Patients' Location Search Activities***

142.    Just as SFR would report details of patients' keyword and provider searches to Facebook, SFR would also inform Facebook about details of patients' location searches.

143.    Upon a patients's navigation to the page for SFR's locations, SFR would transmit PageView and Microdata events reporting the patients's navigation to "https://stfrancis-shakopee.com/locations/."

144.    Patients could filter SFR's directory of locations based on parameters such as services offered and zip code. Mirroring its disclosures about patients' physician searches, SFR would likewise inform Facebook about the parameters that patients used when conducting their locations searches.

145.    For example, when a patient filtered SFR locations for those that offered cancer services near the zip code, 55379, in the city, Shakopee, SFR would send a PageView event reporting the patient was viewing SFR locations based on "query=Cancer" in "cities=Shakopee&zip=55379."



146.    Then, SFR would continue to report patients' activities as they loaded pages from their search results. If the patient loaded the page for the St. Francis Cancer Center, for instance, SFR would send PageView and Microdata events disclosing that the patient loaded the page for "locations/st-francis-cancer-center/" from their location search results.

147.    If the patient clicked to call the St. Francis Cancer Center, SFR would also report that activity through a SubscribedButtonClick event informing Facebook the patient dialed "952.428.4131," while they were visiting the page, "St. Francis Cancer Center | St. Francis Regional Medical Center."

***SFR Disclosed Patients' Service Browsing Activities***

148.    SFR also disclosed information about patients as they browsed medical services offered by SFR.

149.    For example, when a patient navigated to learn about SFR's emergency room services, SFR would send a SubscribedButtonClick event, disclosing the patient's click to "Learn more" about "services/emergency-room," and PageView and Microdata events, disclosing the patient was learning about SFR's "Emergency Department."

150.    As the patient clicked to view wait times, SFR would send another SubscribedButtonClick event, reporting that the patient clicked a button labeled "See wait times for ER and urgent care," while they were on the page for "Emergency room | St. Francis Regional Medical Center."



151.    Likewise, when a patient clicked to learn about SFR's urgent care or express care services, SFR would send more SubscribedButtonClick events. Then, as the patient loaded the page about SFR's express care appointments, SFR would send PageView and Microdata events, revealing the patient's navigation to a page about "express-care-appointments/," where they could "Schedule your Express Care appointment online."

152.    SFR would also reveal information about patients as they explored SFR medical services tailored to specific conditions.

153.    When a patient browsed SFR's birthing services, for instance, SFR would report the patients' browsing details to Facebook. As a patient loaded the Services page, and then navigated to the Birthing Services page, SFR would send a SubscribedButtonClick event, and then PageView and Microdata events to Facebook.



154.    The SubscribedButtonClick event reveals the patient clicked to view SFR's "Services," and the PageView and Microdata events both reveal that the patient loaded the page "https://stfrancis-shakopee.com/services/birthing-services/."

155.    Once the patient was on SFR's Birthing Services page, SFR would continue to report patient activities to Facebook. For instance, if the patient clicked to call SFR's Birthing Center or navigated to a page about the Milk Depot, SFR would report details about each activity to Facebook.

156.    As a patient clicked to call the Birthing Center, SFR would send a SubscribedButtonClick event disclosing that the patient clicked to call "952-428-2062," while they were browsing the page for "Birthing services | St. Francis Regional Medical Center."

157.    When the patient loaded the Milk Depot page, SFR would transmit a pair of PageView and Microdata events, reporting the patient's navigation to a page about "birthing-services/milk-depot," with the Microdata event further divulging that the patient was learning that SFR is a "drop-off and purchase site for donated breast milk."



158.    If the patient then clicked to email SFR about donating breast milk, SFR would send a SubscribedButtonClick event, informing Facebook the patient clicked to email

"donatemilk@mnmilkbank.org."

***SFR Disclosed Patients' Billing Related Activities***

159.    SFR would also report patients' billing related activities to Facebook as well.

160.    When a patient navigated to the Patients and Visitors page and then loaded the Billing Information page, SFR would transmit a SubscribedButtonClick event and then a set of PageView and Microdata events, divulging that the patient clicked a button labeled, "Patients and visitors," and then visited the page, "https://www.stfrancis-shakopee.com/patients-and-visitors/billing-information/."



161.    From the Billing Information page, patients could click to pay their medical bills through MyChart. SFR would inform Facebook as a patient clicked to pay their medical bills and loaded the Patient Account & MyChart page.

162.    When the patient clicked to pay their medical bills, SFR would send a SubscribedButtonClick event revealing the patient's clicked to "Pay your bill online" on the "Billing information" page.

163.    Then, as the next page loaded, SFR would send PageView and Microdata events inform Facebook that patient navigated to the page, "https://www.stfrancis-shakopee.com/patients-and-visistors/patient-account-mychart," after they viewed the page with "billing-information/" for patients and visitors.



***Defendants Disclosed Patients' Activities on the MyChart Patient Portal***

80.     Finally, SFR also installs Google Analytics, Microsoft UET, DoubleClick Ads, and Google Tag Manager on the Allina Health/MyChart patient portal pages.

81.     For example, when a patient navigates to the "Sign in to your account | View health record" page to log into their MyChart portal, Defendants' UET tracker sends a pageLoad event of this activity to Microsoft.



82.     On information and belief, patients' Private Information stored on Defendants'

MyChart health record database is shared with Google and Microsoft via the trackers installed by Defendants as its patients use the patient portal.

80.     SFR could have chosen not to use the Meta Pixel and other tracking technology such as Google Analytics, DoubleClick Ads, and Microsoft UET or it could have configured its trackers to limit the information that it communicated to third parties, but it did not. Instead, it intentionally took advantage of these trackers' features and functions, resulting in the Disclosure of Plaintiffs' and Class Members' Private Information.

81.     SFR used and disclosed Plaintiffs' and Class Members' Private Information to Facebook, Google, and Microsoft and potentially others, for the purpose of marketing its services and increasing its profits and reducing its marketing costs.

82.     On information and belief, SFR shared, traded, or sold Plaintiffs' and Class Members' Private Information with Facebook and other third-party technology companies in exchange for improved targeting and marketing services and reduced marketing costs.

83.     Plaintiffs and the proposed Class Members never consented, agreed, authorized, or otherwise permitted SFR to intercept their communications or to use or disclose their Private Information for marketing purposes. Plaintiffs and the proposed Class Members, patients of Defendants, were never provided with any written notice that Defendants disclosed its patients' Protected Health Information to Facebook, Google, and others, nor were they provided adequate means of opting out of such disclosures. SFR nonetheless knowingly disclosed Plaintiffs' and Class Members' Private Information including Private Information to unauthorized entities.

84.     Plaintiffs and Class Members relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

85.    Furthermore, SFR actively misrepresented it would preserve the security and privacy of Plaintiffs' and Class Members' Private Information. In actuality, SFR shared data about Plaintiffs' and Class Members' activities on the Online Platforms alongside identifying details about the Plaintiff and Class Members, such as their IP addresses.

86.    By law, Plaintiffs and the Class Members are entitled to privacy in their Private Information, including Protected Health Information, and confidential communications. SFR deprived Plaintiffs and Class Members of their privacy rights when it; (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential communications, Personally Identifiable Information, and Private Information, (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook and others, and (3) undertook this pattern of conduct without notifying Plaintiffs and Class Members and without obtaining their express written consent.

**B.  Plaintiff Cathy Gebhardt-Lally's Experience**

87.    Plaintiff Cathy Gebhardt-Lally ("Ms. Gebhardt-Lally") has been a patient of SFR for approximately forty years.

88.    Ms. Gebhardt-Lally has received various healthcare services from SFR including primary care, emergency care/urgent care and physical therapy

89.    Ms. Gebhardt-Lally used SFR's Website and Online Platforms beginning on or around 2012 and last on or around February 2024. Ms. Gebarrdt-Lally used Defendants' Website and Online Platforms approximately once a week during this timeframe.

90.    Ms. Gebhardt-Lally used the Website and Online Platforms, *inter alia*, to schedule appointments, pay medical bills, and find a primary care doctor.

91.    Ms. Gebhardt-Lally used Defendants' MyChart patient portal to message her

doctors and view test results.

92.    Ms. Gebhardt-Lally also used the Website's Search bar to search for specific doctors and treatment information, including the following search terms: "Bariatric," "Sleep apnea," and "Endocrinology."

93.    After Ms. Gebhardt-Lally used the Online Platforms, she received tailored advertisements for sleep apnea therapy, other sleep apnea treatments, sleeping devices, and for weight loss products.

94.    Ms. Gebhardt-Lally relied on Defendants' Website and Online Platforms to communicate confidential patient information.    She discovered that Defendants were unauthorizedly disclosing her Private Information to Facebook via the Meta Pixel and other trackers in February 2024.

95.    Ms. Gebhardt-Lally accessed Defendants' Online Platforms at SFR's direction and encouragement in relation to her past, present, and future health and healthcare needs.

96.    Ms. Gebhardt-Lally reasonably expected that her online communications with Defendants were confidential, solely between herself and Defendants, and that, as such, those communications would not be transmitted to or intercepted by a third party.

97.    Ms. Gebhardt-Lally provided her Private Information to Defendants and trusted that the information would be safeguarded according to Defendants' Privacy Policy and the law.

98.    On information and belief, through its use of the Meta Pixel and other tracking technologies, Defendants disclosed to Facebook:

a.    the pages and content Ms. Gebhardt-Lally viewed;

b.    Ms. Gebhardt-Lally's seeking of medical treatment;

c.    Ms. Gebhardt-Lally's status as a patient;

48

    d.    information regarding Ms. Gebhardt-Lally's patient portal activity;

    e.    the specialties of the medical providers Ms. Gebhardt-Lally searched for and viewed;

    f.    the names of the medical providers Ms. Gebhardt-Lally searched for and viewed;

    g.    the search results that Ms. Gebhardt-Lally clicked on;

    h.    the medical services Ms. Gebhardt-Lally viewed; and,

    i.    Ms. Gebhardt-Lally's identity via her IP addresses and/or "c_user" cookie and/or Facebook ID.

99.    By failing to receive the requisite consent, SFR breached confidentiality and unlawfully disclosed Ms. Gebhardt-Lally's Private Information.

100.    As a result of Defendants' Disclosure of Ms. Gebhardt-Lally's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Ms. Gebhardt-Lally has suffered the following injuries:

    a.    Loss of privacy; unauthorized disclosure of her Private Information; unauthorized access of his Private Information by third parties;

    b.    Ms. Gebhardt-Lally now receives targeted health-related advertisements on Facebook and elsewhere online, reflecting her private medical treatment information;

    c.    Ms. Gebhardt-Lally paid Defendants for medical services and the services she paid for included reasonable privacy and data security protections for her Private Information, but Ms. Gebhardt-Lally did not receive the privacy and security protections for which she paid, due to Defendants' Disclosures;

d.    The portion of Defendants' revenues and profits attributable to collecting Ms. Gebhardt-Lally's Private Information without authorization and sharing it with third parties;

e.    The portion of Defendants' savings in marketing costs attributable to collecting Ms. Gebhardt-Lally's Private Information without authorization and sharing it with third parties;

f.    The portion of Defendants' revenues and profits attributable to serving and monetizing advertisements directed to Ms. Gebhardt-Lally as a result of collecting her Private Information without authorization and sharing it with third parties;

g.    Value to Ms. Gebhardt-Lally of surrendering her choice to keep her Private Information private and allowing Defendants to track her data. The amount of these damages can be based on a baseline monthly compensation provided to participants in a Google consumer research study, the Ipsos Screenwise Panel where the baseline compensation to participants was $3 per device per month;

h.    Embarrassment, humiliation, frustration, and emotional distress;

i.    Decreased value of Ms. Gebhardt-Lally's Private Information;

j.    Lost benefit of the bargain;

k.    Increased risk of future harm resulting from future use and disclosure of her Private Information; and

l.    Statutory damages.

**C.  Plaintiff Patrick Witt's Experience**

101.    Plaintiff Patrick Witt ("Mr. Witt") has been a patient of SFR for approximately twenty years.

102.    Mr. Witt has received various healthcare services from SFR including for podiatry services.

103.    Mr. Witt used SFR's Website and Online Platforms beginning on or around 2014 and last on or around July 2023. Mr. Witt used Defendants' Website and Online Platforms multiple times per year during this timeframe.

104.    Mr. Witt used the Website and Online Platforms, *inter alia*, to schedule appointments, research topics related to podiatry, and to find a podiatrist.

105.    After Mr. Witt used the Online Platforms, he received tailored advertisements on his Facebook feed and elsewhere online for podiatry services and other services related to his health.

106.    Mr. Witt relied on Defendants' Website and Online Platforms to communicate confidential patient information. He discovered that Defendants were unauthorizedly disclosing her Private Information to Facebook via the Meta Pixel and other trackers in July 2023.

107.    Mr. Witt accessed Defendants' Online Platforms at SFR's direction and encouragement in relation to his past, present, and future health and healthcare needs.

108.    Mr. Witt reasonably expected that his online communications with Defendants were confidential, solely between himself and Defendants, and that, as such, those communications would not be transmitted to or intercepted by a third party.

109.    Mr. Witt provided his Private Information to Defendants and trusted that the information would be safeguarded according to Defendants' Privacy Policy and the law.

110.    On information and belief, through its use of the Meta Pixel and other tracking

technologies, Defendants disclosed to Facebook:

    a.    the pages and content Mr. Witt viewed;

    b.    Mr. Witt's seeking of medical treatment;

    c.    Mr. Witt's status as a patient;

    d.    information regarding Mr. Witt's patient portal activity;

    e.    the specialties of the medical providers Mr. Witt searched for and viewed;

    f.    the names of the medical providers Mr. Witt searched for and viewed;

    g.    the search results that Mr. Witt clicked on;

    h.    the medical services Mr. Witt viewed; and,

    i.    Mr. Witt's identity via his IP addresses and/or "c_user" cookie and/or Facebook ID.

111. By failing to receive the requisite consent, SFR breached confidentiality and unlawfully disclosed Mr. Witt's Private Information.

112. As a result of Defendants' Disclosure of Mr. Witt's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Mr. Witt has suffered the following injuries:

    a.    Loss of privacy; unauthorized disclosure of his Private Information; unauthorized access of his Private Information by third parties;

    b.    Mr. Witt now receives targeted health-related advertisements on Facebook and elsewhere online, reflecting his private medical treatment information;

    c.    Mr. Witt paid Defendants for medical services and the services he paid for included reasonable privacy and data security protections for his Private Information, but Mr. Witt did not receive the privacy and security

protections for which he paid, due to Defendants' Disclosures;

d.    The portion of Defendants' revenues and profits attributable to collecting Mr. Witt's Private Information without authorization and sharing it with third parties;

e.    The portion of Defendants' savings in marketing costs attributable to collecting Mr. Witt's Private Information without authorization and sharing it with third parties;

f.    The portion of Defendants' revenues and profits attributable to serving and monetizing advertisements directed to Mr. Witt as a result of collecting his Private Information without authorization and sharing it with third parties;

g.    Value to Mr. Witt of surrendering his choice to keep his Private Information private and allowing Defendants to track his data. The amount of these damages can be based on a baseline monthly compensation provided to participants in a Google consumer research study, the Ipsos Screenwise Panel where the baseline compensation to participants was $3 per device per month;

h.    Embarrassment, humiliation, frustration, and emotional distress;

i.    Decreased value of Mr. Witt's Private Information;

j.    Lost benefit of the bargain;

k.    Increased risk of future harm resulting from future use and disclosure of his Private Information; and

l.    Statutory damages.

**D. Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of Private Information**

113.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[88] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

114.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[89]

115.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that matter, more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[90] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then

---

[88] Kurt Wagner & Bloomberg, *Facebook Admits Another Blunder with User Data*, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.
[89] *Report on Investigation of Facebook Inc. Data Privacy Concerns*, NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES (Feb. 18, 2021)
https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.
[90] Justin Sherman, *Your Health Data Might Be for Sale*, SLATE (June 22, 2022 at 5:50 a.m.)
https://slate.com/technology/2022/06/health-data-brokers-privacy.html.

use the data for all kinds of activities including targeted advertising.  In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing her data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[91]

116.    More recently, Facebook employees admitted to lax protections for sensitive user data.  Facebook engineers on the ad business product team conceded in a 2021 privacy review that "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[92]

117.    In June 2022, an investigation by The Markup[93] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[94] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[95] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or

---

[91] *Id.*

[92] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does with Your Data*, or Where It Goes: Leaked Document, VICE (June 21, 2024) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

[93] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. *See* www.themarkup.org/about (last accessed June 21, 2024).

[94] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[95] *Id.*

household—creating an intimate receipt of the appointment request for Facebook."[96]

118.    During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[97]

119.    In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[98]

120.    David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated he was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.[99]

**E.  Defendant Violated HIPAA Standards**

121.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[100]

122.    If a HIPAA covered entity engages a business associate to help it carry out its health care activities and functions, the covered entity must have a written business associate agreement ("BAA") or other arrangement with the business associate that establishes specifically what the

---

[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

business associate has been engaged to do and requires the business associate to comply with the Rules' requirements to protect the privacy and security of protected health information.[101]

123.    Facebook will not sign a BAA and therefore is not HIPAA complaint.[102]

124.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

125.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[103]

126.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis

---

[101] *Covered Entities and Business Associates*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/covered-entities/index.html (last visited Aug. 12, 2024).

[102] Liyanda Tembani, *Is Facebook HIPAA compliant? (Update 2024)*, PAUBOX, https://www.paubox.com/blog/facebook-hipaa-compliant (last visited Aug. 12, 2024).

[103] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

27-CV-24-14694

CASE 0:24-cv-04100-LMP-TNL    Doc. 1-1    Filed 11/01/24    Page 60 of 90    Filed in District Court
State of Minnesota
9/30/2024 3:54 PM

added).[104]

127.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and

Human Services (HHS) has issued a Bulletin to highlight the obligations of HIPAA-covered

entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and

Breach Notification Rules ("HIPAA Rules") when using online tracking technology (the

"December 2022 Bulletin").[105]

128.    According to the Bulletin, "HIPAA Rules apply when the information that

regulated entities collect through tracking technologies or disclose to tracking technology vendors

includes protected health information."[106]

129.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking
technology vendors and such sharing may be unauthorized disclosures of PHI with
such vendors. **Regulated entities are not permitted to use tracking technologies
in a manner that would result in impermissible disclosures of PHI to tracking
technology vendors or any other violations of the HIPAA Rules**. For example,
disclosures of PHI to tracking technology vendors or marketing purposes, without
individuals' HIPAA-compliant authorizations, would constitute impermissible
disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy
Rule but also may result in a wide range of additional harms to the individual or
others. For example, an impermissible disclosure of PHI may result in identity theft,
financial loss, discrimination, stigma, mental anguish, or other serious negative
consequences to the reputation, health, or physical safety of the individual or to
others identified in the individual's PHI. Such disclosures can reveal incredibly
sensitive information about an individual, including diagnoses, frequency of visits

---

[104] *Marketing*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Dec. 3, 2002)
https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketin
g.pdf.
[105] *See* archived version of the December 2022 Bulletin at *HHS Office for Civil Rights Issues
Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy
and Security of Health Information*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Dec.
1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/for-
professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 21, 2024).
[106] *Id.*

to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[107]

130.    In other words, HHS has expressly stated that Defendants' conduct of implementing the Meta Pixel is a violation of HIPAA Rules.

### F.    Defendant Violated FTC Standards, and the FTC and HHS Take Action

131.    The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[108]

132.    On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[109]

133.    Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[110] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you

---

[107] *Id.* (emphasis in original) (internal citations omitted).

[108] *Re: Use of Online Tracking Technologies*, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), attached as Exhibit A.

[109] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[110] *Id.*

do not use the information obtained through use of a tracking technology for any marketing purposes."[111]

134.    Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id.* According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[112]

135.    Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[113]

136.    As such, the FTC and HHS have expressly stated that conduct like Defendants' runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

137.    On March 18, 2024, HHS updated its December 2022 bulletin in the "March 2024 Bulletin," expanding the circumstances in which HHS would consider information from any

---

[111] *Id.*
[112] *Statement of the Commission: On Breaches by Health Apps and Other Connected Devices,* U.S. FED. TRADE COMMISSION, (Sept. 15, 2021) https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).
[113]   *See, e.g., U.S. v. Easy Healthcare Corp.,* Case No. 1:23-cv-3107 (N.D. Ill. 2023); *In the Matter of BetterHelp, Inc.,* FTC Dkt. No. C-4796 (July 14, 2023),; *U.S. v. GoodRx Holdings, Inc.,* Case No. 23-cv-460 (N.D. Cal. 2023); *In the Matter of Flo Health Inc.,* FTC Dkt. No. C-4747 (June 22, 2021).

unauthenticated website visitor to be considered PHI, and its disclosure to be a violation of HIPAA.[114],[115]

138.    The March 2024 Bulletin added guidance on when the disclosure of individually identifiable health information ("IIHI") is impermissible under HIPAA, explaining that: "the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI *if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care*."[116]

139.    However, in contrast, when a user visits a website related to his or her past, present, or future health, health care, or payment for health care, such as "…looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care[,]" such that the disclosure of their information would be PHI, HIPAA rules apply, and that disclosure would be a violation of HIPAA.[117]

**G.  Defendants Violated Industry Standards**

---

[114] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH AND HUMAN SVCS. OFFICE FOR CIVIL RIGHTS (Dec. 1, 2022, updated Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[115] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

[116] *Supra,* n.92 (bold, italicized emphasis added).

[117] *Id.*

140.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

141.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to SFR and its physicians.

142.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

143.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

144.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

**H. Plaintiffs' and Class Members' Expectation of Privacy**

171.    At all times when Plaintiffs and Class Members provided their Private Information to Defendants, they all had a reasonable expectation that the information would remain private and that Defendants would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

**I. IP Addresses are Personally Identifiable Information**

172.    Defendants also disclosed and otherwise assisted Facebook and possibly others with intercepting Plaintiffs' and Class Members' IP addresses using the Meta Pixel, Google Analytics, DoubleClick Ads, Microsoft UET, and other tracking technologies.

173.    An IP address is a number that identifies the address of a device connected to the Internet.

174.    IP addresses are used to identify and route communications on the Internet.

175.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

176.    Facebook tracks every IP address ever associated with a Facebook user.

177.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

178.    Under HIPAA, an IP address is Personally Identifiable Information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.  *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

179.    In their Privacy Policy, Defendants admit they collect their website user's IP addresses and personally identify users of their website.[118]

180.    Consequently, by disclosing IP addresses, Defendants' business practices violated HIPAA and industry privacy standards.

**J. Defendants Were Enriched and Benefitted from the Use of The Pixel and**

---

[118] *See* Ex. B.

**Unauthorized Disclosures**

181.    Defendants' use of the Meta Pixel and other tracking technology was for the tortious purpose of invading Plaintiffs' and Class Members' privacy, breaching its fiduciary duty, and violating HIPAA, all for marketing and profits.

182.    In exchange for disclosing the Private Information of its patients, Defendants are compensated by Facebook and likely others in the form of enhanced advertising services and more cost-efficient marketing on its platform.

183.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendants re-targeted patients and potential patients.

184.    By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendants.

**K. Plaintiffs' and Class Members' Private Information Had Financial Value**

185.    Data collected via the Meta Pixel, Google Analytics DoubleClick Ads, and Microsoft UET and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements. Targeting works by allowing advertisers to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[119] Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app,

---

[119] *Audience Ad Targeting*, META, https://www.facebook.com/business/ads/ad-targeting (last visited June 21, 2024).

or engaging in certain online content.[120] Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."[121]

186.    Plaintiffs and Class Members have a recognizable property interest in their browsing history. That browsing history has economic value, and by sharing, or facilitating the sharing of, such information with third parties such as Google and Facebook without prior approval, Defendants took something of value from Plaintiffs and Class Members and provided it to third parties without compensating Plaintiffs and Class Members for the use of their Private Information and data, thus, causing the Plaintiffs and Class Members economic injury.

187.    Plaintiffs' and Class Members' Private Information, which was taken by Defendants without permission, had value even though it was not "for sale." The browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. There is an entire data industry and estimates suggest that that industry generates billions of dollars.

188.    Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.[122]

189.    This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per

---

[120] *Id.*

[121] *See How to Create a Lookalike Audience on Meta Ads Manager*, META BUSINESS CENTER, https://www.facebook.com/business/help/465262276878947 (last visited June 21, 2024).

[122] *See* Rishi Iyengar, *Here's How Big Facebook's Ad Business Really Is*, CNN (Updated 9:19 AM July 1, 2020), https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html.

American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

190.     In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, Time Magazine described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[123]

191.     Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[124]

## TOLLING, CONCEALMENT, AND ESTOPPEL

192.     The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

193.     Defendants seamlessly incorporated Meta Pixel and other trackers such as Google Analytics, DoubleClick Ads, and Microsoft UET into their Website and Online Platforms while providing patients with no indication that their Website usage was being tracked and transmitted to third parties. Defendants knew that their Website incorporated the Meta Pixel and other trackers, yet they failed to disclose to Plaintiffs and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, Google, and other third parties.

---

[123] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME, (Jan. 9, 2017 at 9:00 a.m.), https://time.com/4588104/medical-data-industry/.
[124] *See* Christina Farr, *Hospital Execs Say They are Getting Flooded with Requests for Your Health Data*, CNBC, (Dec. 18, 2019 at 8:27 a.m.), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

194.    Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because Defendants' disclosures were insufficient and/or misleading and such disclosures did not inform patients that the Website they were interacting with employed the Meta Pixel and other tracking technologies to transmit their Private Information to third party technology companies.

195.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendants' illegal interception and disclosure of Plaintiffs' and the Class's Private Information continues unabated up to the present day. What is more, SFR was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

196.    Plaintiffs bring this class action on behalf of themselves, and on behalf of all other similarly situated persons pursuant to Minn. R. Civ. Proc. 23.

197.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**All patients of SFR residing in the United States whose Private Information was disclosed by Defendants to third parties through the Meta Pixel and related technology without authorization.**

198.    Further, Plaintiffs seek to represent a Minnesota Subclass, defined as:

**All Minnesota citizens whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

199.    The Nationwide Class and Minnesota Subclass are collectively referred to as "the Class."

200.    Excluded from the Class are the following individuals and/or entities: Defendants

and Defendants' parents, subsidiaries, affiliates, officers, and directors, and any entity in which
Defendants have a controlling interest; all individuals who make a timely election to be excluded
from this proceeding using the correct protocol for opting out; and all judges assigned to hear any
aspect of this litigation, as well as their immediate family members.

201.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class
before the Court determines whether certification is appropriate.

202.    This action satisfies the numerosity, commonality, typicality, and adequacy
requirements under Minn. R. Civ. Proc. 23.

203.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is
impracticable. Upon information and belief, there are hundreds or thousands of individuals whose
Private Information may have been improperly used or disclosed by Defendant, and the Class is
identifiable within Defendant's records.

204.    <u>Ascertainability</u>. Class Members are readily identifiable from information in
Defendant's possession, custody, and control.

205.    <u>Commonality and Predominance</u>: Questions of law and fact common to the Class
exist and predominate over any questions affecting only individual Class Members. These include:

     a.    whether and to what extent Defendants had a duty to protect Plaintiffs' and
Class Members' Private Information;

     b.    whether Defendants had duties not to disclose the Plaintiffs' and Class
Members' Private Information to unauthorized third parties;

     c.    whether Defendants had duties not to use Plaintiffs' and Class Members'
Private Information for non-healthcare purposes;

     d.    whether Defendants had duties not to use Plaintiffs' and Class Members'

Private Information for unauthorized purposes;

e.    whether Defendants failed to adequately safeguard Plaintiffs' and Class Members' Private Information;

f.    whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.    whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h.    whether Defendants failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

i.    whether Defendants were negligent;

j.    whether an implied contract existed between Plaintiffs and the Class and Defendants;

k.    whether Defendants breached their implied contracts with Plaintiffs and the Class Members;

l.    in the alternate, whether Defendants were unjustly enriched;

m.    whether Defendants committed invasion of privacy—intrusion upon seclusion;

n.    whether Defendants violated the Minnesota Health Records Act, Minn. Stat. § 144.291, et seq.;

o.     whether Defendants violated the Minnesota Uniform Deceptive Trade Practice Act, Minn. Stat. § 325d.43-48;

p. whether Plaintiffs and the Class Members are entitled to monetary damages, including compensatory and statutory damages, and the sums thereof.

q. whether Defendant committed invasion of privacy—intrusion upon seclusion;

206. Defendants have engaged in a common course of conduct toward Plaintiffs and the Class Members, in that the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully disclosed and accessed in the same way. As set forth above, the common issues arising from Defendants' conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

207. Typicality: Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendants' use and incorporation of Meta Pixel and other tracking technology.

208. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

209. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or

adverse to the Class Members and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

210.    <u>Superiority and Manageability</u>: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against larger organizations such as Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

211.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendants would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and

duplicative of this litigation.

212.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

213.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

214.    Unless a Class-wide injunction is issued, Defendants may continue in their unlawful use and disclosure and failure to properly secure the Private Information of Plaintiffs and the Class Members, Defendants may continue to refuse to provide proper notification to and obtain proper consent from Class Members, and Defendants may continue to act unlawfully as set forth in this Complaint.

215.    Moreover, Defendants have acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

216.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

> a.    whether Defendants owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;
>
> b.    whether Defendants breached a legal duty to Plaintiffs and Class Members

to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.      whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

d.      whether an implied contract existed between Defendants on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e.      whether Defendants breached the implied contract;

f.      in the alternate, whether Defendants were unjustly enriched;

g.      whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Private Information had been used and disclosed to third parties;

h.      whether Defendants failed to implement and maintain reasonable security procedures and practices;

i.      whether Defendants committed the tort of invasion of privacy—intrusion upon seclusion.

j.      whether Defendants violated the Minnesota Health Records Act, Minn. Stat. § 144.291, et seq.;

k.      whether Defendants violated the Minnesota Uniform Deceptive Trade Practice Act, Minn. Stat. § 325d.43-48;

l.       whether Plaintiffs and the Class Members are entitled to actual, compensatory, consequential, and/or nominal damages, and punitive

damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

217.    Plaintiffs re-allege and incorporates the above allegations as if fully set forth herein.

218.    Defendants owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiffs' and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

219.    Defendants acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiffs' and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendants.

220.    Defendants owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' disclosure of their Private Information to benefit third parties and Defendants. Defendants actively sought and obtained Plaintiffs' and Class Members' Private Information.

221.    Private Information is highly valuable, and Defendants knew, or should have known, the harm that would be inflicted on Plaintiffs and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendants

by way of data harvesting, advertising, and increased sales.

222.    Defendants breached their common law duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers in the handling and securing of Private Information of Plaintiffs and Class Members. This failure actually and proximately caused Plaintiffs' and Class Members' injuries.

223.    In addition, the standards of care owed by Defendants are established by statute, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, under which Defendants were required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' Private Information.

224.    Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

225.    Defendants had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Private Information, PII and PHI.

226.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information, PII and PHI, in compliance with applicable laws would result in an unauthorized third-parties such as Facebook, and others gaining access to Plaintiffs' and Class Members' Private Information, and resulting in Defendants' liability under the principles of negligence.

227.    Defendants violated the standards of care under Section 5 of the FTC Act and under

HIPAA and attendant regulations by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII and PHI and not complying with applicable industry standards as described in detail herein.

228.    As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, inappropriate advertisements, and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

229.    Plaintiffs' and Class Member's Private Information constitutes personal property that was taken and misused as a proximate result of Defendants' negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

230.    Defendants' breach of its common-law duties to exercise reasonable care and negligence, directly and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their Private Information by third parties; improper disclosure of their Private Information; receipt of targeted advertisements reflecting private medical information; lost benefit of their bargain; lost value of their Private Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendants' negligence; value to Plaintiffs and the Class Members of surrendering their choices to keep their Private Information private and allowing Defendants to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiffs' and the Class Members' Private Information; and other injuries and damages as set forth herein. These injuries are ongoing,

imminent, immediate, and continuing.

231.     Defendants' negligence directly and proximately caused the unauthorized access and Disclosure of Plaintiffs' and Class Members' Private Information, PII and PHI, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendants' conduct. Plaintiffs and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendants' negligence.

<u>**COUNT II**</u>
**INVASION OF PRIVACY—INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiffs and the Class)**

171.     Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

172.     Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendants via their Website and Online Platforms.

173.     Plaintiffs and Class Members communicated sensitive PHI and PII—Private Information—that they intended for only Defendants to receive and that they understood Defendants would keep private.

174.     As set forth above, Defendants disclosed Plaintiffs' and the Class Members' Private Information and confidential communications to Facebook and other third parties, without their authorization or knowledge.

175.     Defendants' disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion in their private affairs and concerns.

176.     Plaintiffs and Class Members had a reasonable expectation of privacy given Defendants' representations in its Privacy Policies and elsewhere. Moreover, Plaintiffs and Class

Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

177.     Defendants' Disclosure of PHI coupled with PII—Private Information—is highly offensive to the reasonable person.

178.     As a result of Defendants' actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights, and other injuries and damages as set forth in the preceding paragraphs.

179.     Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

180.     Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

181.     Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiffs and the Class)

182.     Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

183.     As a condition of receiving medical care from Defendants, Plaintiffs and the Class provided their Private Information and paid compensation for the treatment received.

184.     In so doing, Plaintiffs and the Class entered into contracts with Defendants by which Defendants agreed to safeguard and protect such information, in its Privacy Policies and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen. Implicit in the

27-CV-24-14694

CASE 0:24-cv-04100-LMP-TNL    Doc. 1-1    Filed 11/01/24    Page 81 of 90    Filed in District Court
State of Minnesota
9/30/2024 3:54 PM

agreement between Defendants and its patients, Plaintiffs and the proposed Class Members, was the obligation that both parties would maintain the Private Information confidentially and securely.

185.    Defendants had an implied duty of good faith to ensure that the Private Information of Plaintiffs and Class Members in their possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from Defendants.

186.    Defendants had an implied duty to protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses.

187.    Additionally, Defendants implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

188.    Plaintiffs and Class Members fully performed their obligations under the implied contract with Defendants. Defendants did not. Plaintiffs and Class Members would not have provided their confidential Private Information to Defendants in the absence of their implied contracts with Defendants and would have instead retained the opportunity to control their Private Information for uses other than receiving medical treatment from Defendants.

189.    Defendants breached the implied contracts with Plaintiffs and Class members by disclosing Plaintiffs' and Class Members' Private Information to unauthorized third parties, including Facebook, Google, Microsoft and others.

190.    Defendants' acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiffs and Class Members to provide their Private Information in exchange for medical treatment and benefits.

191.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class have suffered (and will continue to suffer) injury-in-fact and damages, including monetary damages; loss of privacy; unauthorized disclosure of Private Information; unauthorized

access to Private Information by third parties; use of the Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of Private Information; lost benefit of the bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of their information.

192.    As a direct and proximate result of Defendants' above-described breach of contract, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

### COUNT IV
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

193.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

194.    This claim is pleaded solely in the alternative to Plaintiffs' breach of implied contract claim.

195.    Plaintiffs and Class Members conferred a monetary benefit upon Defendants in the form of valuable sensitive medical information—Private Information—that Defendants collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendants collected, used, and disclosed this information for their own gain, for marketing purposes, and for sale or trade with third parties.

196.    Plaintiffs and Class Members would not have used Defendants' services, or would have paid less for those services, if they had known that Defendants would collect, use, and disclose their Private Information to third parties.

197.    Defendants appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

198.    As a result of Defendants' conduct, Plaintiffs and Class Members suffered actual

damages in an amount equal to the difference in value between their purchases made with reasonable data privacy practices and procedures that Plaintiffs and Class Members paid for, and those purchases with unreasonable data privacy practices and procedures that they received.

199.    The benefits that Defendants derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members themselves. Under unjust enrichment principles, it would be inequitable for Defendants to retain the profit and/or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Petition.

200.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein.

**COUNT V**
**VIOLATION OF THE MINNESOTA HEALTH RECORDS ACT,**
**MINN. STAT. § 144.291, ET SEQ.**
**(On Behalf of Plaintiffs and the Class)**

171.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

172.    Under the Minnesota Health Records Act, "health record" means any information, whether oral or recorded in any form or medium that relates to the past, present, or future physical or mental health or condition of a patient; the provision of healthcare to a patient; or the past, present, or future payment of provision of healthcare to a patient. Minn. Stat. § 144.291, subd. 2(c) (the "MHRA").

173.    The Private Information of Plaintiffs and Class Members that was surreptitiously recorded and transmitted to Facebook, Google and Microsoft via Defendants' Meta Pixel, possibly CAPI, and other trackers falls within the definition of "Health Records" as that term is defined by the MHRA.

174.    Plaintiffs and Class Members are "patients" as that term is defined under the

81

MHRA at all times relevant under Minn. Stat. §144.291, subd. 2(g).

175.    Under the MHRA, it is unlawful for a third party to access a patient's health records from a provider, or a person who receives records from a provider, without the patient or the patient's legally authorized representative's consent, specific authorization in law, or a representative from a provider that holds a signed and dated consent from the patient authorizing the release. Minn. Stat. § 144.293, subd. 2(1-3).

176.    Through the Meta Pixel, possibly CAPI, and other trackers, Defendants released Plaintiffs' and Class Members' health records to Facebook, Google, Microsoft, and possible other third parties.

177.    Neither Plaintiffs nor Class Members consented to have their records released via the Meta Pixel, CAPI, DoubleClick Ads,  Google Analytics,  Google Tag Manager, or Microsoft Universal Event Tracking.

178.    Defendants' installation of the Pixel and CAPI and other trackers on its Website constitutes an "affirmative" release under Minnesota law. *See* Larson v. Nw. Mut. Ins. Co., 855 N.W.2d 293, 302 (Minn. 2014).

179.    Defendants' affirmative release of Plaintiffs' and the Class's Private Information in the Disclosure was an intentional affirmative release.

180.    Defendants' release of Plaintiffs' and the Class Members' health information directly and proximately caused them actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information and diminution in value, emotional distress, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused

82

by Defendants' conduct. These injuries are ongoing, imminent, immediate, and continuing.

181.    Under the MHRA, a provider or other person who causes an unauthorized release of a health record by negligently or intentionally releasing the health record is liable to the patient for compensatory damages, plus costs and reasonable attorneys' fees. Minn. Stat. § 144.298, subd. 2.

182.    Pursuant to the MHRA, Plaintiffs and the Class seek compensatory damages, plus costs and reasonable attorneys' fees, and all other relief allowed by law, including injunctive and declaratory relief.

### COUNT VI
**VIOLATION OF THE MINNESOTA UNIFORM DECEPTIVE
TRADE PRACTICE ACT, MINN. STAT. § 325D.43-48
(On Behalf of Plaintiffs and the Class)**

171.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

172.    The Minnesota Uniform Deceptive Trade Practice Act, Minn. Stat. § 325D.43-48 ("MDUPTA") prohibits deceptive trade practices in person's business, vocation, or occupation. *See* Minn. Stat. § 325D.44(1).

173.    Defendants advertised, offered, or sold goods or services in Minnesota— specifically medical services—and therefore engaged in business directly or indirectly affecting the people of Minnesota.

174.    By the conduct complained of in the preceding paragraphs, Defendants violated Minn. Stat. § 325D.44, including, but not limited to, the following provisions: (7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (14) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

175.    Defendants engaged in deceptive and unfair acts and practices, misrepresentation,

and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the MDUPTA, including, but not limited to, the following:

a.  Encouraging patients to use SFR's Website and Online Platforms while representing its commitment to protecting the privacy of the Private Information and promising patients in their Privacy Policy that "disclosure of protected health information submitted through this Site is governed exclusively by our Notice of Privacy Practices"[125] and then promising patients in their Notice of Privacy Practices that "[w]e may use or disclose health information only with your written permission, except as described above. Most uses and disclosures of . . . health information for marketing purposes, and the sale of health information require written authorization."[126]

b.  Despite these representations, Defendants disclosed to third parties information relating to Plaintiffs' and Class Members' medical treatment, without their knowledge, consent, or authorization, as part of a scheme, artifice or device with the intent to mislead patients.

c.  Plaintiffs and Class Members relied on Defendants' representations in using SFR's Website and Online Platforms and thought they were communicating only with their trusted healthcare provider.

d.  By installing and implementing the Meta Pixel, Defendants knew or reasonably should have known it intercepted and transmitted Plaintiffs' and Class Member's communications from Plaintiffs' and Class Members' browsers directly to Facebook. Likewise, by potentially installing or implementing CAPI, Defendants

---

[125] *See* Ex. B.
[126] *See* Ex. A.

84

knew or reasonably should have known that it recorded on its servers and transmitted to Facebook Plaintiffs' and Class Member's confidential communications.

176.    These actions also constitute deceptive and unfair acts or practices because Defendants knew their Website contained the Meta Pixel and potentially CAPI and also knew the Pixel and CAPI would be unknown and/or not easily discoverable by Plaintiff sand Class Members.

177.    Defendants intended that Plaintiffs and Class Members rely on their deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendants' offering of goods and services.

178.    Had Defendants disclosed to Plaintiffs and Class Members that its Website was transmitting Private Information to Facebook via the Pixel and CAPI, Plaintiffs and the Class Members would not have provided their Private Information to Defendants.

179.    Defendants' wrongful practices were and are injurious to the public because those practices were part of Defendants' generalized course of conduct that applied to the Minnesota Class.

180.    Plaintiffs and the Minnesota Class have been adversely affected by Defendants' conduct and the public was and is at risk as a result thereof.

181.    As a result of Defendants' wrongful conduct, Plaintiffs and Class Members were injured in that they never would have provided their Private Information to Defendants, or purchased Defendants' services, had they known or been told that Defendants failed to maintain sufficient security to keep their Private Information from being taken and misused by others.

182.    As a direct and proximate result of Defendants' violations of the MDUPTA,

Plaintiffs and Class Members have suffered harm, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information and diminution in value, emotional distress, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendants' conduct. These injuries are ongoing, imminent, immediate, and continuing.

183.    Pursuant to MDUPTA, Plaintiffs and the Class are entitled to injunctive relief and other appropriate relief, as allowed by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, CATHY GEBHARDT-LALLY and PATRICK WITT, and on behalf of all others similarly situated, pray for judgment as follows:

A.    for an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs; counsel as Class Counsel;

B.    for an award of actual damages, compensatory damages, consequential damages, and punitive damages, in an amount to be determined, as allowable by law;

C.    for equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

D.    for equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and unlawfully disclosed to third parties;

27-CV-24-14694

CASE 0:24-cv-04100-LMP-TNL    Doc. 1-1    Filed 11/01/24    Page 89 of 90    Filed in District Court
State of Minnesota
9/30/2024 3:54 PM

E.    for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

F.    for an award of attorneys' fees under the common fund doctrine, and any other applicable law;

G.    costs and any other expenses, including expert witness fees incurred by Plaintiff in connection with this action;

H.    pre and post-judgment interest on any amounts awarded; and

I.    such other and further relief as this court may deem just and proper.

**JURY DEMAND**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all issues so triable.

Dated: September 30, 2024          Respectfully submitted,

_/s/Raina C. Borrelli_
Raina C. Borrelli, MN State Bar No. 0392127
Samuel J. Strauss (*Pro Hac Vice* forthcoming)
STRAUSS BORELLI, PLLC
One Magnificent Mile
980 North Michigan Avenue, Suite 1610
Chicago, Illinois 60611
(872) 263-1100
raina@straussborrelli.com
sam@straussborrelli.com

David Cates, #6289198
Katie E. St. John, #6340448
THE CATES LAW FIRM, LLC
216 West Pointe Drive, Suite A
Swansea, Illinois 62226
(618) 277-3644
(618) 277-7882 (facsimile)
dcates@cateslaw.com
kstjohn@cateslaw.com

Lynn A. Toops

27-CV-24-14694

Filed in District Court
State of Minnesota
9/30/2024 3:54 PM

Mallory K. Schiller (*Pro Hac Vice* forthcoming)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mschiller@cohenandmalad.com

J. Gerard Stranch, IV (*Pro Hac Vice* forthcoming)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
Emily E. Schiller (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com
eschiller@stranchlaw.com

***Counsel for Plaintiff and the Proposed Class***

88